**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| MARK DADDAZIO and | : |
| PATRICIA BLAUSER, | : |
| on behalf of | : |
| themselves and all others | : |
| similarly situated | : |
| | : |
|     Plaintiffs, | : |
| | :   Civil Action No. _____ |
|     vs. | : |
| | :   Complaint - Class Action |
| VALERIE A. ARKOOSH, in | : |
| her official | : |
| capacity as Acting Secretary of | : |
| the Pennsylvania Department | : |
| of Human Services, | : |
| | : |
| | : |
|     Defendant. | : |

_____

## COMPLAINT – CLASS ACTION

### Introduction

1.    Plaintiffs are residents of state psychiatric hospitals who bring this action on behalf of themselves, and others similarly situated, against Defendant Valerie A. Arkoosh, Acting Secretary of the Pennsylvania Department of Human Services (DHS), for failing to provide them with mental health services in the most integrated settings appropriate to their needs and, instead, unnecessarily segregating them in congregate

1

institutions for people with mental illness, in violation of federal law.  In support thereof, Plaintiffs allege as follows:

2.　　There are more than 800 individuals with psychiatric disabilities who are civilly committed to and reside in six Pennsylvania state hospitals. These hospitals house hundreds of people in the same building or set of buildings, needlessly segregating large numbers of people who could be served at the same or less cost to the state in far more integrated settings in their communities. The institutional structure of the state hospitals deprives residents of liberties and choices most citizens take for granted, such as the opportunity to read a book in private, to choose what to have for dinner, to have a job, to decide when to wake up in the morning, and to come and go when desired. People frequently stay in state hospitals for many years even though, with appropriate services and supports, most can live in more integrated, community-based settings.

3.　　Plaintiff Mark Daddazio is one such person. Mr. Daddazio, who has been diagnosed with bipolar disorder, is 38-years-old and is a resident at Wernersville State Hospital, where he has lived since February 2017. Despite the recommendations of his treatment team for over a year that he be discharged from the state hospital into the community, there are "no

beds available in the community" or "no community placements will accept him."

4.     In fact, Mr. Daddazio could be discharged and live successfully in the community if he receives appropriate mental health services and supports. Instead, he has spent the past six years—most of his thirties— locked in a state psychiatric hospital, away from his friends, his family, and his community, with no opportunities to live a normal and productive life. He remains institutionalized in a state hospital because DHS has failed to meet its legal obligations to ensure that community-based services are timely available to him.

5.     Mr. Daddazio is not alone. There are numerous individuals who remain unnecessarily confined in state psychiatric hospitals or who are at risk of unnecessary institutionalization because there are inadequate community-based mental health services available to them.

6.     DHS has the ultimate responsibility to ensure the provision of mental health services, including community-based services, to all residents in Pennsylvania who need them. DHS, however, fails to make appropriate individualized determinations of what services—either services already available or services that could be developed—that state hospital

residents need to live in the community. Instead, DHS has chosen to continue to segregate state hospital residents.

7.      In allocating funds between institutional and community-based services, DHS fails to allocate sufficient funds to the counties to enable them to develop appropriate, community-based services for Plaintiffs who are appropriate for discharge. DHS also fails to access potential federal funding that could be used to supplement state funding to expand access to community-based mental health services.

8.      As a result of years of underfunding the development of infrastructure in the counties to serve those persons who need mental health services, the counties cannot provide community-based services to all persons who need them, including the Plaintiffs and similarly situated state hospital residents.

9.      DHS has no viable integration plan for its state hospital residents, as required by federal law. It has failed to adequately assess and identify state hospital residents who could be discharged to the community. It has failed to identify mental health services and supports that must be developed to serve state hospital residents and allow them to be discharged to their communities. It has failed to identify benchmarks and timelines for discharge of state hospital residents.

10.    DHS also wastes significant taxpayer dollars funding expensive, institutional placements instead of community placements. The cost of institutional care is far more costly to agencies and taxpayers.

11.    DHS violates the integration mandate of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131–12134, 28 C.F.R. § 35.130(d), by continuing to segregate Plaintiffs without justification and by failing to provide Plaintiffs and similarly situated state hospital residents with mental health services in the most integrated setting appropriate to their needs.

12.    DHS also violates the ADA by using methods of administration that have the effect of subjecting Plaintiffs to discrimination on the basis of their disability by (a) failing to adequately fund the counties to enable them to develop the array of services necessary to meet the needs of Plaintiffs and all similarly situated state hospital residents; (b) failing to maximize federal Medicaid funding for community-based MH services; (c) failing to develop and implement a viable integration plan with benchmarks and timelines; and (d) failing to adequately perform appropriate individual assessments of state hospital residents' service needs in the community which would enable Plaintiffs to be discharged.  28 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(3)(i).

5

13.     Plaintiffs seek appropriate declaratory and injunctive relief to remedy the above-referenced violations of their rights under the ADA.

## Jurisdiction and Venue

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and §1343(a)(3) and (4).

15.     Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201–02 and Fed. R. Civ. P. 65. Plaintiffs' causes of action for disability discrimination are authorized by 42 U.S.C. § 1983 and 42 U.S.C. § 12133.

16.     Venue is proper under 28 U.S.C. § 1391(b), given that DHS has offices located in this district.

## Parties

17.     Plaintiff Mark Daddazio is a 38-year-old resident of Lebanon County who is institutionalized at Wernersville State Hospital.

18.     Plaintiff Patricia Blauser is a 21-year-old resident of Venango County who is institutionalized at Warren State Hospital.

19.     Defendant Valerie A. Arkoosh is Acting Secretary of DHS. DHS is the single-state agency responsible for the provision of mental health services, both institutional and community-based, to eligible residents of the Commonwealth. DHS also has responsibility to assure that its

programs are administered in accordance with federal law, including the

ADA. Defendant Arkoosh is responsible for overseeing and administering

DHS and its programs, including the provision of institutional and

community-based mental health programs, and to ensure that they comply

with federal law. Defendant Arkoosh is sued in her official capacity only for

actions and omissions under color of state law.

## Class Action Allegations

20.    Pursuant to Fed. R. Civ. P. 23(a) and (b)(2), the named

Plaintiffs bring this action on behalf of themselves and the following class of

persons: Current and future residents of Pennsylvania's six state-operated

psychiatric hospitals, excluding individuals subject to commitment pursuant

to 50 P.S. § 7401–07 (commitments of persons charged with a crime or

under sentence), and 42 Pa. Cons. Stat. Ann. § 6403 (court-ordered

involuntary treatment for certain sexual offenses).

21.    The prerequisites of Federal Rule of Civil Procedure 23(a) are

satisfied:

a.    The size of the class is so numerous as to make joinder

of all class members impractical. There are more than 800 civilly committed

residents in the state hospital system. Each of these individuals is entitled

to receive services in the least restrictive environment possible and the

state hospital system has an obligation to ensure that each of these individuals is appropriately evaluated for inclusion in the community.

b.     There are issues of fact and law common to the Plaintiffs and members of the class, including but not limited to: (1) whether DHS fails to perform proper, individualized assessments to determine the community-based services that residents need for them to be discharged; (2) whether DHS fails to adequately fund counties to enable them to develop appropriate community-based programs for residents; (3) whether DHS has a viable, working integration plan with benchmarks and timelines; (4) whether DHS violates the ADA by failing to provide services to residents in the most integrated setting appropriate to their needs; and (5) whether DHS violates the ADA by using methods of administration that have the effect of discriminating against state hospital residents by continuing their unnecessary institutionalization.

c.     Plaintiffs' claims are typical of class members. The Named Plaintiffs are individuals with mental health disabilities who have been committed to one of Pennsylvania's six state hospitals. The Named Plaintiffs have not been adequately assessed to determine the community-based services they need to be discharged. The Named Plaintiffs remain segregated in state hospitals rather than receiving services in the most

integrated settings appropriate to their needs. Putative class members are in a similar situation due to DHS's failure to conduct appropriate individualized assessments and its failure to fund appropriate community options.

      d.    Plaintiffs will adequately represent the interests of class members. Plaintiffs have no interests adverse or in conflict with other class members. Their counsel has extensive experience in the areas of class action litigation and civil rights laws concerning people with disabilities and enforcement of the ADA. Plaintiffs' counsel has previously successfully litigated similar cases involving the unnecessary segregation of people with disabilities in the Commonwealth's state hospitals.

    22.   This case can proceed as a class action pursuant to Fed. R. Civ. P. 23 (b)(2). DHS has acted or refused to act on grounds generally applicable to all members of the class, making final declaratory and injunctive relief appropriate with respect to the class. DHS has unnecessarily segregated Plaintiffs and class members in the state hospitals, refusing to provide them with services in the most integrated setting appropriate to their needs (i.e., the community). DHS has also used methods of administration that have the effect of discriminating against Plaintiffs and class members by failing to provide adequate funding to the

counties to enable them to develop appropriate community-based services for Plaintiffs and class members and by failing to perform appropriate individualized assessments of Plaintiffs' and class members' community service needs.

## Factual Allegations

## Pennsylvania's Structure for the Provision of Mental Health Services

23.    Pursuant to Pennsylvania's Mental Health and Intellectual Disability Act (MH/ID Act), 50 P.S. § 4101 *et. seq*., the Commonwealth is responsible "to assure within the state the availability and equitable provision of adequate mental health services for all persons who need them..." *Id.* at § 4201(1).

24.    The Department of Human Services, Office of Mental Health and Substance Abuse Services (OMHSAS), has the primary responsibility for program development, policy, and financial oversight of the delivery of mental health treatment services. The Department oversees the delivery of community mental health services administered by counties under the MH/ID Act. Direct mental health treatment services are also provided through six state-operated psychiatric hospitals and one long-term care nursing facility.

25.    Two of the state hospitals, Norristown State Hospital and Torrance State Hospital, also have forensic units that provide psychiatric services to individuals involved in the criminal justice system. The forensic units are separate from the civil commitment units.

26.    The total number of people in the civil commitment units of the six state hospitals on December 31, 2022, was 874, an increase of over forty residents since December 31, 2020.

27.    Except for the state psychiatric hospitals, the long-term mental health services provided by DHS are provided in community-based settings. These settings are residences or small facilities, are smaller than the state hospitals, are integrated in the communities, and provide opportunities for individuals to participate in community life.

28.    The structure and restrictiveness of the settings in which Pennsylvania offers long-term mental health services vary widely. They include, but are not limited to, the following:

a.    Independent living, in which the individual resides in his or her own residence and receives community support services, which may include counseling, case management, assistance with activities of daily living, peer support, medication monitoring, and day programming;

11

b.      Supported housing, in which a provider provides an apartment, individually or with others, with or without on-site staff, and the individual receives an array of community support services, as described in paragraph 28(a);

c.      Partial-care Community Residential Rehabilitation Services (CRRs), in which the individual resides in a group-home type setting where staff is on-site on a regularly scheduled basis and where a limited range of personal assistance and psychosocial rehabilitation services are provided on-site, and an array of support services are provided off-site;

d.      Full-care CRRs, in which the individual resides in a group-home type setting in which staff are on-site 24/7 and where a full range of personal assistance and psychosocial rehabilitation services are provided on-site, and other support services may be provided off-site;

e.      Personal Care Boarding Homes (PCBHs), in which no more than sixteen individuals reside who require assistance or supervision with Activities of Daily Living. Staff are available on-site 24/7 in order to provide a range of supportive services. Clinical and other services are available off-site;

f. Specialized group-home type settings for individuals with co-occurring issues (including substance abuse and intense medical needs), in which staff are on-site whenever a client is there and a full range of personal assistance, psychosocial rehabilitation, and other services to address the co-occurring issues are provided and in which other support services may be provided off-site;

g. Long-Term Structured Residences (LTSRs), which are highly structured therapeutic residential mental health treatment facilities in which no more than sixteen individuals reside and receive an array of support services; and

h. State psychiatric hospitals, which provide residential services in an extremely highly structured and secure setting and in which residents receive an array of support services on-site, including counseling, day programming, vocational rehabilitation, medication monitoring, and medical services.

29. Although the various settings offer a continuum of structure and security, the services available both in the community and in state psychiatric hospitals overlap substantially. Those services include psychiatric and psychological counseling, medication monitoring, access to medical and dental care, social rehabilitation, vocational rehabilitation, and

occupational therapy. Moreover, because of the flexible size and structure and programming that community-based programs can provide, individuals who need specialized treatment or small settings are far more likely to receive them in the community than in the state hospital.

30.    Community mental health services are administered by single counties, county joinders, or through contracts with private, non-profit organizations.

31.    The Commonwealth is responsible for 100% of the funding for the six state hospitals. None of the state hospital funding is provided by the counties.

32.    Community mental health services are funded with state, federal, and/or county matching funds. The Commonwealth is responsible for about 90% of the costs of community-based mental health services; the remaining 10% is the counties' responsibility. Federal funding, primarily through the Medical Assistance program, defrays part of the Commonwealth's costs for non-residential, community-based services provided by the counties.

33.    DHS's general allocations to the counties for mental health services are the primary funding sources for the counties' provision of community based mental health services. DHS's mental health allocations

to the counties historically have been insufficient to provide community-based services to persons with mental health illness—both those institutionalized in state psychiatric hospitals who are ready for discharge as well as those in the community who are waiting for such services.

## The State's CHIPP Program

34.    The ADA's integration mandate requires the Commonwealth to provide services to individuals with disabilities in the most integrated settings appropriate to their needs. This mandate prohibits the unnecessary institutionalization of people with disabilities and compels covered entities, such as DHS, to ensure that they have viable integration plans to move individuals with disabilities who are unnecessarily institutionalized from institutional to community-based settings.

35.    To comply with the ADA's integration mandate, states may choose to implement a viable integration plan, called an Olmstead Plan, that has benchmarks and timelines for discharge. DHS's most recent Olmstead Plan was published in 2016. That plan provides that the State's integration mandate for people with mental health disabilities will be carried out through its use of the Community Hospital Integration Projects Program (CHIPP), which was first established in Fiscal Year 1991–1992.

36.    Through CHIPP, DHS allocates funding to a particular county or group of counties for the specific purpose of developing the resources necessary to discharge residents of those counties from state psychiatric hospitals who no longer need inpatient psychiatric treatment into integrated community programs. The CHIPP program is a mechanism for reallocating funds to the community for the development of new alternative community-based treatment services and supports and to fund existing services and supports to ensure that the infrastructure for interventions and treatment in the community is in place to accommodate and support individuals as they are discharged from state hospitals.

37.    The community services that are intended to be developed with CHIPP funds should be available to persons discharged from state mental hospitals and to other individuals with mental illness who would otherwise need hospitalization. For each CHIPP allocation, it is estimated that an additional four to five individuals with mental illness could be served per year. The program was intended to support community living by creating a community capacity for diversion services to avoid future unnecessary state hospital admissions.

38.    Each county has a certain number of state hospital beds available to that county. Counties that accept a CHIPP-funded "slot" to

enable the county to develop and fund community-based mental health services are required to give up their access to one state hospital bed. In other words, CHIPP was designed to link the provision of community-based services to the closure of beds in the state psychiatric hospitals.

39.    The State's 2016 Olmstead Plan requires that DHS request funding for at least ninety CHIPP slots each fiscal year to provide critical services and supports to individuals leaving the hospital and returning to live in the communities of their choice. That Plan was consistent with OMHSAS's efforts in the several years prior to the Plan's publication to fund at least ninety CHIPP slots annually.

40.    But the Commonwealth has not complied with its 2016 Olmstead Plan since Fiscal Year (FY) 2017–18. In FY 2018–19 and 2019–20, only forty-five CHIPP slots were funded. In FY 2020–21, and for every fiscal year since then, only twenty CHIPP slots have been funded—far below the number required under the state's Olmstead Plan. For FY 2023–24, only twenty slots have been proposed to be funded.

41.    In addition, DHS has failed to ensure since at least FY 2016–17 that the CHIPP slots that are funded are actually used by the counties to both close state hospital beds and to develop community mental health

17

infrastructure—a key part of the Commonwealth's plan to move towards deinstitutionalization.

42.    The total number of CHIPP participants fell dramatically from 155 in FY 2015–16 to only twenty-one in FY 2016–17, thirty-three in FY 2017–18, less than eleven in FY 2018–19, and twelve in FY 2019–20.

43.    In addition to the drastically reduced number of CHIPP-funded slots, the amount of each CHIPP-funded slot is $125,000, which is woefully insufficient to serve most persons who need mental health services in the community. As a result, some counties refuse to utilize some of the CHIPP slots available to them, given the requirement they forego a state hospital bed in exchange for the insufficient CHIPP funding.

44.    DHS has failed to maximize federal Medicaid dollars through a Medicaid 1915i State Plan Amendment (SPA) or other possible Medicaid programs, which would allow the state to obtain federal dollars to provide home and community-based services for adults with mental illness.

45.    In 2012, $84 million of base mental health funding was cut from the counties, resulting in sweeping cuts to available mental health services. This funding has not been restored despite repeated requests from the counties and advocacy organizations. This has resulted in what the County Commissioners Association of Pennsylvania calls a "crumbling mental

18

health system." *Cntys. Recently Received Confirmation That the Cnty. Mental Health Base Would Not See an Increase*, *Despite the Increase of $43 Million to the Overall Line*, Cnty. Comm'rs Ass'n (Aug. 1, 2022), [Counties Receive No Increase in Funding for Mental Health - County Commissioners Association of Pennsylvania CCAP (pacounties.org).](pacounties.org)

46.    DHS's failure to fund an adequate number of CHIPP slots, its failure to adequately fund each CHIPP slot, its failure to secure additional funding, and its failure to maximize available federal funding have directly caused a shortage of community placement options, which leads to the unnecessary segregation of the Plaintiffs and members of the Plaintiff class at the six state hospitals.

47.    Many counties do not have a full array of community-based residential options for state hospital residents and most existing community-based residential programs have waiting lists, resulting in individuals being "stuck" in state hospitals when they could live in the community.

48.    On information and belief, DHS knows that there are individuals, like the named Plaintiffs and many others, who are on waiting lists for community placements and who could live in the community if they had access to community mental health services through the CHIPP

program or other sources of state funding yet who remain unnecessarily institutionalized.

49.    Despite this knowledge, DHS has not sought funding to expand the number of CHIPP slots or the per-person CHIPP allocation, and, to the contrary, has decreased CHIPP funding even though individuals are unnecessarily institutionalized in state hospitals or at risk of unnecessary institutionalization. Likewise, DHS has not sought a Medicaid 1915i SPA or other Medicaid waivers that would increase federal funding to expand home and community-based services.

50.    On information and belief, the cost of funding residential and non-residential community mental health services to the named Plaintiffs and to the putative class members would be less than the cost of providing them with services in state psychiatric hospitals where they are unnecessarily segregated.

51.    DHS has a history of closing state psychiatric hospitals and, when it did so, it transitioned most individuals in those state hospitals to community residences and programs. On information and belief, there are no differences between the individuals discharged by the state when they closed state hospitals in the past and the individuals who are languishing in state hospitals today.

## Failure to Adequately Assess State Hospital Residents for
## <u>Community Placement and to Plan for Discharge</u>

52.    Treatment teams in the six state psychiatric hospitals routinely fail to ascertain whether residents could be served in the community if services were developed to meet their needs. Instead, treatment team recommendations for discharge are based on the capacity of the individual to fit into existing programs that have available beds. Because some counties do not have community placement options that the treatment teams believe are necessary for the residents to be served in the community, treatment teams simply do not recommend them for discharge, even though services could be developed to meet their needs.

53.    DHS ostensibly assesses and plans for discharge of hospital residents by completing a "Community Support Plan (CSP)."  According to the DHS's 2016 Olmstead Plan, the goal of the CSP is to "assess each hospital resident's needs and define the supports needed for each consumer to live in the most integrated setting appropriate to his or her needs."  But the actual CSPs, to the extent they are even completed, fail to assess the residents' needs and fail to define the supports they need to live in the community.

54.    Because DHS does not appropriately or accurately assess the class members' needs to live in the community, DHS lacks the information needed to plan for the development of those needed services.

55.    Together, the lack of appropriate and accurate assessments of needs and the lack of planning to develop the supports and services to meet those needs results in the unnecessary segregation of people with mental illness in the most restrictive setting possible—the state psychiatric hospitals.

**Named Plaintiff Allegations**

**Mark Daddazio**

56.    Plaintiff Mark Daddazio is a 38-year-old Lebanon County resident who was involuntarily committed to Wernersville State Hospital (WSH) on February 9, 2017—over six years ago. He remains unnecessarily institutionalized there to this day.

57.    Mr. Daddazio has a diagnosis of bipolar disorder.

58.    Mr. Daddazio has been recommended for discharge to a Long-Term Structured Residence or Personal Care Boarding Home by his treatment team since at least January 2022, but, according to his records, there are "no beds available in the community" and "no community placements will accept him."

59.    Rather than determining Mr. Daddazio's needs and then developing a community support and discharge plan to fit those needs, the treatment team's assessment is limited in scope to attempts to fit him into existing community-based services that may not be necessary or adequate.

60.    According to the state hospital records, with appropriate supports and services, Mr. Daddazio could live in the community.

61.    The community is the most integrated setting appropriate to Mr. Daddazio's needs. All services and supports that he receives at WSH could be provided in the community.

62.    DHS has failed to properly assess Mr. Daddazio's community service needs and has failed to fund sufficient appropriate community-based residential and non-residential programs to serve Mr. Daddazio.

63.    As a result of the DHS' failures, Mr. Daddazio, who wishes to live in the community, remains indefinitely and unnecessarily segregated at Wernersville State Hospital, in violation of the ADA.

### *Patricia Blauser*

64.    Plaintiff Patricia Blauser is a 21-year-old woman from Venango County who was involuntarily committed to Warren State Hospital on October 7, 2021. She remains unnecessarily institutionalized there to this day.

65.     Ms. Blauser has a diagnosis of bipolar disorder.

66.     According to a February 2023 Report and Recommendation of Mental Health Review Officer, although the state hospital social worker and the county "have made significant efforts to find options for discharge" for Ms. Blauser, there are no placements in the community that will accept her.

67.     Rather than determining Ms. Blauser's needs and then developing a community support and discharge plan to fit those needs, the treatment team's assessment is limited in scope to attempts to fit her into existing community-based services that may not be necessary or adequate.

68.     According to the state hospital records, with appropriate supports and services, Ms. Blauser could live in the community.

69.     The community is the most integrated setting appropriate to Ms. Blauser's needs. All services and supports that she receives at Warren State Hospital could be provided in the community.

70.     DHS has failed to fund sufficient appropriate community-based residential and non-residential programs to serve Ms. Blauser.

71.     As a result of DHS' failures, Ms. Blauser, who wishes to live in the community, remains indefinitely and unnecessarily segregated at Warren State Hospital, in violation of the ADA.

24

## Claims

### COUNT I
### Violation of the ADA's Integration Mandate

72.    Paragraphs 1–71 are incorporated by reference.

73.    Plaintiffs bring this claim against Defendant Arkoosh in her official capacity only. Plaintiffs seek only declaratory and injunctive relief on this claim.

74.    Plaintiffs are qualified individuals with disabilities because they have mental disabilities that substantially limit one or more of their major life activities (including, interacting with others, working, and self-care) and are qualified to receive state-funded mental health services. 42 U.S.C. §§12101(2), 12131(2). Plaintiffs and the class they propose to represent are therefore protected by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.

75.    DHS, which is administered by Defendant Arkoosh, is a "public entity" subject to the ADA. 42 U.S.C. § 12131(1)(B).

76.    Defendant violates Title II of the ADA by failing to provide services to Plaintiffs in the most integrated setting appropriate to their needs. 42 U.S.C. § 12132; 28 C.F.R. § 35.130 (d); 45 C.F.R. § 84.4(b)(2).

a.      Plaintiffs, and many of the state hospital residents comprising the proposed class, can, with appropriate supports and services, live in community-based programs for persons with mental illness. For these individuals, segregation and institutionalization at the state hospitals is unjustified and unnecessary. Rather, the community is the most integrated setting appropriate to their needs.

b.      Providing services to Plaintiffs and the proposed class in the most integrated setting appropriate to their needs in the community, rather than in segregated institutions, would not result in a fundamental alteration of DHS's programs.

c.      Defendant has no viable plan to ensure that Plaintiffs and the proposed class are provided with services in the most integrated setting appropriate to their needs.

**COUNT II**
**Violation of the ADA by Using Methods of Administration**
**That Have a Discriminatory Effect**

77.    Paragraphs 1–76 are incorporated by reference.

78.    Plaintiffs bring this claim against Defendant Arkoosh in her official capacity only. Plaintiffs seek only declaratory and injunctive relief on this claim.

79.    Defendant violates Title II of the ADA by using methods of administration that have the effect of subjecting Plaintiffs and the proposed class to discrimination on the basis of disability.  42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(3)(i). For example,

a.    Defendant fails to fund and require counties to develop an array of community-based services necessary to meet the needs of Plaintiffs and all similarly situated state hospital residents which discriminates against persons who remain unnecessarily institutionalized in the state hospitals.

b.    Defendant fails to maximize federal Medicaid funding both to expand the array of community-based mental health services and to free up state funds to expand community-based mental health services.

c.    Defendant fails to identify the range of services and supports needed to serve state hospital residents so that appropriate planning can occur to develop those services.

## RELIEF REQUESTED

80.    Plaintiffs respectfully request that the Court grant the following relief:

a.    Exercise jurisdiction over this action;

b.    Certify this case to proceed as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

c.    Issue appropriate declaratory and injunctive relief; and grant such other relief as may be appropriate, including awarding reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 12205.

Date: April 17, 2023              **DISABILITY RIGHTS PENNSYLVANIA**,

By:    */s/* Rhonda Brownstein
Rhonda Brownstein (PA I.D. No. 46866)
Brynne S. Madway (PA I.D. No. 316422)
1800 John F. Kennedy Boulevard
Suite 900
Philadelphia, PA 19103
Office: 215-238-8070
Fax*:* 215-772-3126
rbrownstein@disabilityrightspa.org
bmadway@disabilityrightspa.org

*Counsel for Plaintiff*