# EXHIBIT A



**COMMONWEALTH OF PENNSYLVANIA**
DEPARTMENT OF HUMAN SERVICES

MAY 1 6 2016

Dear Colleagues:

Enclosed is the *Olmstead Plan for Pennsylvania's State Mental Health System* (Plan). This revised Plan, first issued in 2011 and revised in 2013, retains the core elements and principals from the 2013 plan, with a revision explaining new sources of integrated housing through a U.S. Department of Housing and Urban Development demonstration project. Additionally, this Plan includes updates and new steps to help accomplish the goal of ending unnecessary institutionalization of adults with serious and persistent mental illness and children with serious emotional disturbance, including those dually diagnosed with a substance use disorder, medical complications, or an intellectual disability.

The Department of Human Services recommends counties examine this revision and reevaluate their current local plans. Because the Integrated Human Services planning process is occurring at this time, it offers an opportunity for counties to, at the same time, also update their local Olmstead plans and consolidate the planning effort. Section IV of the Plan outlines the parameters for the Local/Regional Implementation Plan. The Local/Regional Olmstead Plan Implementation Template in Appendix A identifies the services, supports, and infrastructure needed to support individuals transitioning back into the community and individuals in the diversion population who may at times need intervention. Counties should use this information to update their plans utilizing the Appendix A format. Counties may submit plans independently or as a collaborative with other counties of their choosing. The Department of Human Services' Office of Mental Health and Substance Abuse Services will follow up this distribution with a communication on the timelines for submission of the local plans.

Please contact Ms. Karen Ulp at kaulp@pa.gov with any questions regarding the Plan. Thank you for your continued partnership.

Sincerely,

Theodore Dallas
Secretary

Dennis Marion
Deputy Secretary for Mental Health
and Substance Abuse Services

Enclosure



**pennsylvania**
DEPARTMENT OF HUMAN SERVICES

Office of Mental Health and Substance Abuse Services

# Olmstead Plan for Pennsylvania's State Mental Health System

**May 2016**



## SECTION I: BACKGROUND

The Olmstead Plan for Pennsylvania's State Mental Health System (Plan), first issued in 2011 and revised in 2013, reflects the commonwealth's continued progress toward ending the unnecessary institutionalization of adults who have a serious and persistent mental illness. The Plan contains specific steps for the commonwealth to take in order to achieve that goal and calls for implementation to be reviewed at regular intervals to assess progress and determine the need for revision and updates. The revised Plan retains the core elements and principles of the original Plan and includes a revision explaining new funding sources for integrated housing through a demonstration project. The demonstration project provides subsidies for affordable rental units for certain eligible individuals. Additionally, this revised Plan includes updates and new steps to help accomplish the goal of ending unnecessary institutionalization of adults with serious and persistent mental illness and children with serious emotional disturbance, including those dually diagnosed with a substance use disorder, medical complication, or intellectual disability. The Plan emphasizes community integration including employment opportunities, while utilizing natural supports to assist individuals on their recovery journey.

Pennsylvania has made significant strides in providing housing and supports in the most integrated settings possible for people with mental illness consistent with Title II of the Americans with Disabilities Act and the 1999 U.S. Supreme Court *Olmstead* decision[1] addressing the issue of unnecessary institutionalization of Pennsylvanians with mental illness. As elsewhere in the nation, the census of Pennsylvania's state hospitals has declined dramatically in the last 40 years, from 35,100 individuals in 1966 to less than 1,400 individuals in civil psychiatric beds in 2013. There are a total of 1,131 civil psychiatric beds within the six state hospitals as of July 2015.  Between January 2010 and December 2015 364 beds have closed. Our progress mirrors the national trend which recognizes that many individuals, who have a disability, including individuals who have a serious and persistent mental illness, can live successfully in the community if they have access to appropriate supports and services.

A successful model of Pennsylvania's effort to develop community alternatives for state hospital residents arose out of the closure of Philadelphia State Hospital (PSH) in 1990. The PSH closure was unique because, for the first time, the commonwealth ensured that the funding that had been used to support the hospital was used to create a network of new and innovative community residential and non-residential programs for the over 500 consumers who were institutionalized at PSH, as well as individuals who, but for its closure, would have been institutionalized in PSH (i.e., the diversion population). Virtually all of the residents of PSH were ultimately discharged to the community. Studies conducted by Dr. Trevor Hadley and Dr. Aileen Rothbard and their colleagues at the University of Pennsylvania found that the individuals discharged were able to live successfully in the community, dispelling the fears of many that these individuals would

---

[1] *Olmstead v. L.C.*, 527 U.S. 581 (1999)

become homeless or would lack access to proper care.

Since the PSH closure, the commonwealth has closed seven additional state hospitals – Woodville State Hospital in 1992, Somerset State Hospital in 1996, Eastern State School and Hospital in 1996, Haverford State Hospital in 1998, Harrisburg State Hospital in 2006, Mayview State Hospital in 2008, and Allentown State Hospital in 2010. The closures of Haverford, Harrisburg, Mayview, and Allentown State Hospitals have supported the discharge of nearly 800 individuals with a range of community-based services, including residential supports (ranging from specialized community residential facilities with 24-hour staff, an array of supported housing options, and independent housing), intensive case management, extended acute care services, crisis services, mobile psychiatric services, psychiatric rehabilitation services, peer support programs, and consumer-run services.

The primary source of funding for these closures, as well as for the downsizing of other state hospitals, has been the Community Hospital Integration Project Program or "CHIPP." The CHIPP initiative provides the funding used to support individuals in the state hospitals to the counties to develop community supports and services for both the state hospital residents and the diversion population, with the understanding that the state hospital beds that supported the individuals will be closed and unavailable to the counties following the discharge. This allows the counties to build community capacity while assuring that the state's obligation to finance state hospitals is decreased due to the bed closures.

The CHIPP initiative has historically targeted the "long-stay" consumers of the state hospital system, who are individuals that have been in residence for at least two years. Since the inception of the CHIPP initiative in 1991, a total of 3,290 beds have been closed in the state mental hospital system. The commonwealth continues to support individuals living in integrated community settings by transferring funds to counties to support the ongoing development of an array of community-based services. In FY 2014/2015, the total CHIPP funding allocated to the counties was $257 million.

In addition to the closures and downsizing of state hospitals funded by the CHIPP initiative, the commonwealth has taken other important steps to support community alternatives for state hospital residents, including:

- Initiation of the service area planning (SAP) process in 2002, in which counties served by each state hospital and other stakeholders work together to develop community service area plans for their regions. The regional service area planning process includes participation by the Department of Human Services' (DHS) Office of Mental Health and Substance Abuse Services (OMHSAS), county mental health programs in the region, consumers, families, advocates, regional providers, and managed care organizations (MCOs), including physical health MCOs (PH-MCOs) and behavioral health MCOs (BH-MCOs) that serve the regions.

2

- Development of community programs based on the Community Support Planning (CSP) process which ensures that consumers, family members, and other persons involved in the recovery process are also able to participate in decision-making.

In the last 20 years, Pennsylvania has indisputably made significant progress in developing community alternatives for people who have a mental illness and decreasing reliance on state hospitals. Our continuing progress depends on the development of a viable integration plan for state hospital residents, for those individuals who live in other large congregate settings, and for those at risk of institutionalization, including, people experiencing homelessness, people who have a criminal justice history, returning veterans, and others.

This Olmstead Plan acknowledges that unwarranted long-term institutionalization in state hospitals and use of large segregated and congregate settings is no longer the norm or current approach to treatment. This Plan also advocates for the viability of permanent supportive housing and the exploration of these opportunities for all individuals. New evidence-based practices and medications enable individuals who have a mental illness to live in the community successfully with, at most, the need for relatively short periods of hospitalization to become stabilized. The Commonwealth of Pennsylvania has extensive capacity within its community hospitals which are capable of meeting individuals' acute hospitalization needs. This means the need for state hospitals, which were designed to house people on a long-term basis, has decreased considerably, while the availability of community-based supports and services has grown substantially.

Children and youth with a serious emotional disturbance (SED) are often involved in multiple systems and receive treatment in a variety of settings. In the behavioral health system, treatment is provided in the most integrated setting possible, including the individual's home or as close to home as possible so that individuals remain connected to family, friends and community. Through the expanding use of evidence-based practices (EBPs), such as Multi-Systemic Therapy (MST) and Functional Family Therapy (FFT), and cross system partnerships in the development of the children's continuum of care, Pennsylvania has made progress in reducing the use of residential treatment facilities (RTFs) and will continue these efforts. State and local collaborations have promoted cross systems work through System of Care initiatives to ensure children and their families are better connected to services in the community. A point in time comparison between 2008 and 2015 demonstrates a significant drop in in-state RTF utilization from 2,372 to 1,362. Similarly, in the same time period, out-of-state RTF utilization dropped from 81 to 30.

Beginning in 2009, OMHSAS has implemented cooperative agreements between the federal Substance Abuse and Mental Health Services Administration (SAMHSA) and the commonwealth focused on the development of a system of care that supports the behavioral health needs of youth within the communities in which they live. The Pennsylvania System of Care Partnership (PA SOC) has worked at both the state and

3

county levels in partnership with youth and families to develop a seamless network of effective services and supports with unified access and integrated across child-serving systems.

In 2014, SAMHSA awarded the commonwealth a grant to serve transition age youth called, "*Now is the Time" Healthy Transitions: Improving Life Trajectories for Youth and Young Adults with, or at Risk for Serious Mental Health Conditions*. This resulted in the PA Healthy Transitions Partnership currently collaborating with three counties to address the complex needs of this age group. The focus is on increasing community awareness to decrease stigma, service development and coordination, including peer supports, and developing service-delivery models of the processes to be shared statewide.

The commonwealth is also committed to a multi-agency, long-term effort to reduce the involvement of individuals with mental illness in the criminal justice system, including those with a co-occurring substance use disorder, and is making progress toward that goal.  The Pennsylvania Commission on Crime and Delinquency's (PCCD) Office of Criminal Justice System Improvements and DHS jointly established the Mental Health and Justice Advisory Committee.  The committee has embarked on a housing initiative to increase community re-entry and jail diversion opportunities for state and county correctional inmates with a mental illness including those with a co-occurring substance use disorder.  This involves individuals at any stage of the justice system from arrest to release, from incarceration to probation, and all points in between.  In 2015, a total of approximately $1 million in state grants were awarded to eight counties to further their supportive housing efforts for this population, such as master leasing arrangements, tenant based bridge subsidies and other housing supports.

The commonwealth is using the Sequential Intercept Model to identify and empower the various points in the criminal justice system where effective intervention can be made to prevent or mitigate individuals' further involvement in the criminal justice system.  To date, 45 of 67 Pennsylvania counties participated in cross system mapping workshops which are based on the five distinct intercept points of the Sequential Intercept Model.  Crisis response, mental health courts, and mental health first aid training are examples of strategies to divert individuals with mental illness and/or co-occurring substance use disorder to treatment and supports rather than incarceration.  In addition, Forensic Peer Support aids Pennsylvania's efforts to divert individuals from incarcerations and/or supports individuals upon release.

In 2009 and 2010, DHS in partnership with PCCD, supported the development of ten mental health courts through state-funded grants.  Nine of these ten mental health courts are still in operation.  Of the 100 problem solving courts in Pennsylvania, which also include drug courts and veteran's courts, there are currently sixteen adult mental health courts and one juvenile mental health court.  Mental health courts divert defendants with mental illnesses into judicially supervised, community-based treatment programs, following specialized screening and assessment.  These courts offer participants of non-

violent crimes an opportunity to avoid incarceration if they agree to comply with community supervision and mandated treatment.

This Olmstead Plan provides the opportunity for the Commonwealth to honor the spirit of the *Olmstead* ruling, while maximizing the utilization of its fiscal and other resources. Some of the available resources include:

- Pennsylvania's mandatory behavioral health managed care program, HealthChoices, provides services to Pennsylvanians enrolled in the Medical Assistance program. Both the capitation dollars provided by the commonwealth to the HealthChoices MCOs and the reinvestment dollars the HealthChoices MCOs generate are used to: increase capacity, develop services that might not otherwise be available, and pay for start-up costs for new programs and other community services.  In this process, the commonwealth takes the opportunity to foster the adoption of best practice approaches.

- Programs available outside of the traditional mental health system that fund services for our citizens who have a mental illness. These include home- and community-based waivers for people who are eligible (e.g., the Aging Waiver for elderly individuals and the Attendant Care and Independence Waivers for those with physical disabilities in addition to mental illness), the Consolidated Waiver for individuals who have intellectual disabilities, services provided through the Department of Aging and the DHS Office of Long Term Living, publicly-funded housing programs, and veterans' programs. In addition, other federal, state, and private benefit sources may be available to assist these individuals (e.g., Social Security Disability, Supplemental Security Income, Medicare, Medical Assistance, education, and veterans' benefits).

- Federal, state, and local housing resources including, but not limited to: federal McKinney-Vento Homeless Assistance Act funds and federally-funded Section 8 Housing Choice Vouchers available through local public housing authorities (PHAs), Pennsylvania Housing Finance Agency Low Income Housing Tax Credit units, especially units made available for people at 20 percent or below of the Area Median Income (AMI) for their location, Pennsylvania Housing Affordability and Rehabilitation Enhancement (PHARE) fund and PennHomes funding, state and local HOME, CDBG, and Trust Fund resources.

  In addition, funds have been awarded by the U.S. Department of Housing and Urban Development (HUD) Section 811 Project Rental Assistance (PRA) Program as authorized through the Frank Melville Supportive Housing Investment Act of 2010.  Pennsylvania applied twice for funding, through a nationwide competitive process, and was awarded $5.7 million in new Section 811 PRA resources in February 2013 and $8.5 million in March 2015. These resources will be targeted to people with disabilities, including those leaving institutions, as project-based

rental subsidies for units in Low Income Housing Tax Credit Projects. An estimated 400 rental units will be available throughout the Commonwealth over the next five years to adults with disabilities including persons with mental illness. Local Lead Agencies (LLAs) will manage the referral and service delivery components of this program.

As part of Pennsylvania's second Section 811 PRA Program request, the Commonwealth and six public housing authorities have committed to providing 151 Housing Choice Vouchers or public housing units for individuals with mental illness as a disability-specific Olmstead preference over the next four years beginning in 2015. The public housing authorities include the Allegheny County Housing Authority, the Housing Authority of Butler County, the Housing Authority of the County of Chester, the Housing Authority of the County of Dauphin, the Housing Authority of the City of Pittsburgh, and the Philadelphia Housing Authority. Each of the counties where these public housing authorities are located has pledged in its local Olmstead Plan to work closely with its LLA and the housing authority to make referrals and provide supportive services for individuals prior to and after they move into units with subsidies.

- Counties are also encouraged to accelerate the transformation of existing programs, housing, employment and treatment services, to newer, more evidenced-based models that promote integration and recovery.

## SECTION II: GUIDING PRINCIPLES

The core principles that serve as the foundation for Pennsylvania's mental health system provide the philosophical framework for this Plan. These include the Community Support Program (CSP), Child Adolescent Service System Program (CASSP), and System of Care standards for services which incorporate consumer and family choice and participation, leadership that is youth and family driven, a strengths-based approach, and service delivery that is culturally competent and community based with natural supports. These principles are embedded in the following values:

1. **Recovery from mental illness is possible. People who have a mental illness can and do recover.**

   Treatment, services, and supports must facilitate recovery. As stated in the Commonwealth's *Call for Change: Toward a Recovery-Oriented Mental Health Service System for Adults*, "recovery is a self-determined, holistic journey that people undertake to heal and grow. It is facilitated by relationships and environments that provide hope, empowerment, choices, and opportunities that promote people reaching their full potential as individuals and community members."

6

2. **People with mental illness can be served in community-based settings.**

   The evidence clearly affirms the findings that people who have a mental illness, with appropriate supports and services, can live as productive, successful, involved members of their communities, and do not need to be institutionalized in large congregate settings. This includes not only adults, but children, youth and young adults transitioning into adult settings.

3. **Consumer needs are best assessed through a CSP or similar planning process such as found in CASSP and System of Care. The planning process ensures consumer voice in the development of the plan, including individual choice in defining the services and supports he or she will need to live in the most integrated community setting.**

   The CSP process serves as the foundation for successful implementation of this Olmstead Plan. DHS will work with counties to plan for the development of a broad array of integrated options to meet the needs of consumers. The CSP process in Pennsylvania has been vital to the design of individualized services and supports that are consumer-centered, consumer-empowered, and culturally competent. Each person's CSP will:

   - Be developed, monitored, and evaluated in partnership with consumers and, as appropriate, with families, involved advocates, specialists (e.g., trauma, spiritual advisors, support coordinators for individuals who have an intellectual disability, probation/parole officers), and knowledgeable provider staff.

   - Identify and utilize each person's specific strengths.

   - Provide services and supports that will meet all of the person's unique needs and preferences, drawing on natural supports, mental health services and supports, and services and supports outside the mental health system.

   - Address the person's special needs (e.g., co-occurring intellectual disabilities, traumatic brain injury, co-occurring substance use disorder) and, when necessary, accommodate communication needs by providing sign language services for consumers who are deaf and interpreting services for consumers with limited English proficiency.

   - Assure that services are flexible, coordinated, and accountable.

   - Recognize, respect, and accommodate differences relating to disability, culture, ethnicity, race, religion, gender, gender identity, and sexual orientation.

- Provide opportunities for individuals to live and work in integrated settings.

## SECTION III: OLMSTEAD PLAN FOR PENNSYLVANIA'S STATE MENTAL HEALTH SYSTEM

Based on the principles outlined above, the commonwealth adopts this updated Plan to provide services and supports to Pennsylvanians with mental illness, in the most integrated settings appropriate to their needs. The priorities of the plan are to: (1) return adults residing in state hospital units to a community of their choice, (2) provide individuals residing in other institutions or large segregated and/or congregate settings the opportunity to live in more integrated settings, (3) divert individuals from institutions and large segregated congregate settings and, (4) provide opportunities for individuals to return to work or resume their education.

Integrated settings are those that enable people with disabilities to interact with people who do not have disabilities to the fullest extent possible. This means individuals with behavioral health needs have opportunities to live in housing where non-disabled persons reside. It also means opportunities exist to participate in education, work or experience activities in the community, not in special programs or jobs primarily created for persons with disabilities.

In support of the above priorities:
- DHS will request funding for at least 90 CHIPP discharges each fiscal year.

- As state hospital units are closed or new funding is appropriated to support discharges from the state hospitals, commonwealth funds used to support those units will be provided to the counties as dedicated CHIPP funds to develop and support necessary community services and infrastructure.

- As part of the planning process, counties should gather information annually from all involved sources including, but not limited to: consumers, families, advocates, providers, counties, PH-MCOs and BH-MCOs, drug and alcohol programs, homeless shelters, housing authorities, prisons, jails, and courts. Based on that information, the county will identify the additional supports, services, and infrastructure to be developed during the course of the implementation of the Plan.

- OMHSAS will use the CSP process to assess the needs of the individuals, including those with dual diagnoses who are preparing to leave services in the state hospital system. The services and supports that individuals are provided upon discharge will be consistent with their CSPs and adequate to assure their successful reintegration into community life. The CSP process may be used by other institutions as part of discharge planning.

8

- OMHSAS will provide technical assistance and support to counties, service providers, and stakeholders to assure integration opportunities are made available with new and existing resources.

- OMHSAS will provide support and assistance to help counties create a variety of residential housing options including supportive housing, further reducing reliance on congregate settings of more than 16 beds for persons with mental illness.

- Funding will continue to be re-directed from state hospitals to the community. Funding for community services must keep pace with the increasing number of persons needing support in the community. The fiscal and social costs of failing to provide necessary supports and services including increased homelessness, unemployment, incarceration, and clinical relapse and de-compensation, far exceed the costs of paying for the needed services. As units and facilities close, the funds and resources that support the operation of the state hospital system will be used to expand the community-based infrastructure to enable individuals who have serious mental illness to be served and supported in their home communities among their family members and friends.

- Counties will be asked to identify other potential public and private funding sources available to serve the needs of consumers, such as: Medical Assistance, Medical Assistance Home and Community-Based Waivers, Vocational Rehabilitation, Medicare, services provided through the Pennsylvania Department of Aging and DHS Office of Long Term Living, federal, state, and local housing agencies (e.g., HUD, PHAs, the Pennsylvania Housing Finance Agency, LLAs, and local housing and redevelopment authorities), and private foundations.

- OMHSAS will review the implementation of the Plan annually to assess and determine the need for revision and updates.

- Stakeholders will be involved in the planning and implementation at all levels of the Plan. Individuals who have a mental illness, family members, advocates, service providers, county mental health officials, commonwealth officials, and other stakeholders will be involved early and continually in the process to develop and implement the Plan.

- OMHSAS will provide regular reports on the implementation of this Plan to the Mental Health Planning Council.

- OMHSAS will continue to partner with the Children's Subcommittee of the Mental Health Planning Council and PA SOC on furthering Pennsylvania's commitment to promoting services in community settings for children, youth,

> young adults and their families.

- DHS will continue to partner with Department of Corrections and PCCD through the Mental Health and Justice Advisory Committee, to expand and advance mental health and justice initiatives.

## **SECTION IV: LOCAL/REGIONAL OLMSTEAD PLAN IMPLEMENTATION**

Through the Olmstead planning process, counties will develop and submit a local/regional Olmstead plan implementation document at a date prescribed by DHS. Counties may submit the plans either individually, as joinders, or in partnerships with other counties of their choosing. The plan will identify with specificity all types of services, supports, and infrastructure that will need to be developed in order to meet the needs of the individuals discharged or diverted from state hospitals, and individuals living in other institutions, or congregate and segregated settings, including personal care homes. This local/regional Olmstead plan implementation document will set timelines for when each service will be developed or transformed and will identify funding sources it will use or seek to implement the Plan. OMHSAS will communicate, with sufficient notice, to counties on the timelines for future updates to their local/regional Olmstead plan implementation documents. The template is included as Appendix A.

Using information gathered from various sources, such as the CSP process, counties will identify what services, supports, and infrastructure will be needed for individuals. Community support planning includes consideration of relapse through planning, prevention and early intervention. It also incorporates the importance of establishing a stable environment in community settings by ensuring the availability of housing options that are not institutional and reinforce both independent and shared living arrangements. Planning also acknowledges that a system of supports needs to be in place to ensure that individuals leaving institutions will have the help available that they need to succeed. This system of supports would include crisis intervention and an array of other mobile outpatient services, including treatment options such as mobile outpatient, medication management, Assertive Community Treatment (ACT), and mobile crisis services, all to prevent the need for a higher level of care. Another key to successful community integration is case management, psychiatric rehabilitation services, community services for youth and young adults including Multi-Systemic Therapy and Functional Family Therapy, and competitive employment opportunities (including supported employment services when warranted). Peer support and peer-run services (e.g., certified peer specialists, drop-in centers, and warm-lines) have proven an important addition to the array of supports and have resulted in the improved quality of life for many individuals moving into independence. Combinations of these supports have yielded successful outcomes in assisting consumers in building skills, developing and sustaining social relationships, enhancing their care environment, and exploring opportunities for gainful employment.

The implementation document should address, at minimum, the following:

- Stable, affordable housing in integrated settings. The plan should describe the integration process for the majority of housing services in the service area, in accordance with Title II of the Americans with Disabilities Act (ADA), including separation of housing from services to allow for greater flexibility and individualization.

- Incorporation of "Housing First" approaches. "Housing First" is an approach used in Permanent Supportive Housing programs. It includes creating access to housing with minimal pre-conditions. This enables individuals to achieve recovery while in housing without making engagement in services or treatment as a pre-condition to receiving housing assistance. This "Housing First" approach includes housing funded through the mental health system and the types of housing that can be funded through other systems (such as public housing or subsidized housing). "Housing First" approaches are being implemented in many jurisdictions for people with serious and complex needs including people who are living in segregated housing programs and institutions, and those experiencing chronic homelessness.

  Consumers generally participate in a range of community-based services and supports, but are not required to participate in services as a condition of tenancy. The major characterization and distinction of "Housing First" programs is that they do not require consumers to be made "ready" for housing as required in continuum models. Staff must be skilled in motivational interviewing and other engagement strategies, wellness coaching, relapse prevention, personal assistance, illness self-management, and tenancy support. "Housing First" programs serve people in non-segregated settings consistent with Title II of the ADA.

- Any changes to existing programs or new programs to be developed, the number of consumers to be served by each program, and the timeline for development of each program.

- The strategies used to maximize resources to meet the housing need of consumers. Each plan will specify the LLA in its service area, how the LLA will be supported at the local level, and how individuals will be referred to the LLA (e.g., using the CSP process). Each plan will also specify the county partnerships with local PHAs, regional housing coordinators, community and housing and redevelopment authorities, Local Housing Options Team, where applicable, and other resources.

- Any plans for Community Residential Rehabilitation Services (CRRS) conversions as set forth in the guidance for CRRS conversions outline in *County Housing Plan Policy*[2].

---

[2] Office of Mental Health and Substance Abuse Services, *County Housing Plan Policy.* Issued August 2007. [Available

- A status update of the services which are offered to assist residents to move into more integrated settings, and the services provided to residents with mental illness outside the home.

- The strategies for specific non-residential supports and services. In updating this section of the plan, it is important to recognize that true integration applies to all types of daily activities and work opportunities. The plan should reference the timelines for development, the number of consumers to be served, the peer supports and peer-run services, and the anticipated funding or other resources for these opportunities.

- How services are meeting the specialized needs of individuals with mental illness who have a dual diagnosis in combination with the following diagnostic conditions:
    - an intellectual disability,
    - substance use disorder,
    - a physical disability, including traumatic brain injury,
    - consumers who are deaf/hearing impaired,
    - consumers who are medically fragile,

    but also, aging conditions:
    - consumers who are elderly,
    - youth, transition age youth, and young adults

    and social conditions:
    - consumers with a criminal justice/juvenile justice history,
    - consumers who are experiencing homelessness
    - consumers with limited English proficiency.

As stated in the initial Plan, if a service area identifies a need for a particular service or support for some of its consumers, but the demand is not sufficient enough to develop the services, OMHSAS will facilitate inter-regional planning to support the development of regional services.

### SECTION V: STATE MENTAL HOSPITAL CONSOLIDATION

The implementation of this Plan will result in a decreasing reliance upon traditional state hospital civil psychiatric resources. Accordingly, DHS will implement its decision-making protocol and approach to repurpose, consolidate, and/or close hospitals during the implementation of the Plan.

At the time the first Plan was written, it was estimated that five to seven percent of the current population in the civil sections of the state hospitals may require a stay in a

---

at: http://www.parecovery.org/documents/County_Housing_Plan_Policy_082007.pdf ]

supervised, structured setting because of their presenting clinical and/or criminal histories. This includes consumers with any of the following issues: sex-offender history, a history of arson, found not guilty by reason of insanity, and other individuals who may present special challenges to receive services and supports in an open, integrated community setting without substantial risk to themselves and/or the general public.

As encapsulated in OMHSAS' vision and mission statement:

"Every individual served by the mental health and substance abuse service system will have the opportunity for growth, recovery, and inclusion in their community, have access to culturally competent services and supports of their choice, and enjoy a quality of life that includes family and friends".

This Plan is a blueprint to make that vision a reality.

**APPENDIX A**

**LOCAL/REGIONAL OLMSTEAD PLAN IMPLEMENTATION TEMPLATE**

(Please review and incorporate *Section IV: Local/Regional Olmstead Plan Implementation* of the guidance to ensure a complete response). Status updates and progress in implementing the Local/Regional Olmstead Plan Implementation will be submitted annually to the Commonwealth.

### I. OLMSTEAD PLANNING PROCESS:

Describe how stakeholders were involved in the development of the Plan. Counties should engage consumers, family members, advocacy groups, providers, behavioral health managed care representatives, and cross-systems partners in the planning process. Stakeholders should be included in the development of the local/regional implementation plan, monitoring of community services and supports, and in providing ongoing input into the county's system for recovery-focused services. Counties should document and demonstrate in their plan how they outreached to and meaningfully engaged their stakeholders.

### II. SERVICES TO BE DEVELOPED:

Using information gathered from various sources, such as done in the CSP process, identify the services, supports, and infrastructure needed to support individuals transitioning back into the community and individuals in the diversion population who may at times need intervention. **Please address each of the following services, including the number of individuals expected to be served, projected timeline for service development, and resources needed**:

a) Prevention and early intervention services and supports (examples: crisis intervention and mobile treatment services).

b) Non-institutional housing options, with a focus on independent and shared living arrangements. Identify existing "Housing First" approaches and discuss plans to develop future approaches.

c) Non-residential treatment services and community supports including mobile treatment options (examples: outpatient and mobile outpatient services, the full range of crisis intervention services, including mobile outreach, Assertive Community Treatment Teams (ACT), medication management, case management, psychiatric rehabilitation services, community services for youth and young adults including Multi-

14

       Systemic Therapy and Functional Family Therapy, and services to develop and provide competitive employment opportunities).

d) Peer support and peer-run services (examples: certified peer specialists, wellness and recovery programs, drop-in centers, warm-lines, etc.).

e) Supported Employment Services.

.

### III. <u>HOUSING IN INTEGRATED SETTINGS:</u>

a) Complete a "housing inventory" of existing housing options available to individuals (please note that available services may be located in other counties).

b) Discuss the progress made towards integration of housing services as described in Title II of the ADA.

c) Describe the plans for Community Residential Rehabilitation (CRR) conversion.

d) Describe strategies used to maximize resources to meet the housing needs of individuals including:

    1. Identifying the Local Lead Agency (LLA) and any agreement with the LLA for referrals and supportive services arrangements.
    2. Describing existing partnerships with local Public Housing Authorities, Regional Housing Coordinators, Community, Housing, and Redevelopment Authorities, and Local Housing Options Teams including any specific referral and/or management Memorandums of Understandings or other agreements.

### IV. <u>SPECIAL POPULATIONS:</u>

Discuss how the following groups of individuals with serious mental illness and their specialized service needs are met:

a) Individuals with a dual diagnosis (mental health/intellectual disability)

b) Individuals with co-occurring disorders (mental health/substance use disorders)

c) Individuals with both behavioral health and physical health needs

15

  d) Individuals with a traumatic brain injury

  e) Individuals with criminal justice/juvenile justice history

  f) Individuals who are deaf or hearing impaired

  g) Individuals who are experiencing homelessness

  h) Older adults

  i) Individuals who are medically fragile

  j) Individuals with limited English proficiency

  k) Transition age youth including young adults

Approved:

_____    5/16/16
Theodore Dallas, Secretary            Date
Department of Human Services


_____    MAY 1 6 2016
Dennis Marion, Deputy Secretary       Date
Office of Mental Health and Substance Abuse
Services

16